[Cite as *Toledo Police Command Officers' Assn. v. State Emp. Relations Bd.*, 2014-Ohio-4341.]

IN THE COURT OF APPEALS OF OHIO
SIXTH APPELLATE DISTRICT
LUCAS COUNTY

Toledo Police Command
Officers' Association

      Appellee

v.

State Employment Relations
Board, et al.

      Appellants

Court of Appeals No. L-13-1074

Trial Court No. CI0201103235

**<u>DECISION AND JUDGMENT</u>**

Decided: September 26, 2014

* * * * *

Gregory T. Lodge, for appellee.

Mike DeWine, Ohio Attorney General, Lori Weisman and
Michael L. Stokes, Assistant Attorneys General, for appellant
State Employment Relations Board.

Adam W. Loukx, Director of Law, and Michael J. Niedzielski,
Chief, Labor and Employment, for appellant City of Toledo.

* * * * *

**YARBROUGH, P.J.**

## I.  Introduction

**{¶ 1}** Appellants, the city of Toledo (the city) and the State Employment Relations

Board (SERB), appeal the judgment of the Lucas County Court of Common Pleas,

reversing SERB's dismissal of appellee's, the Toledo Police Command Officers'

Association (TPCOA), unfair labor practice (ULP) charge. For the following reasons, we

affirm.

## A. Facts and Procedural Background

{¶ 2} The facts of this case, as set forth in SERB's opinion, are not in dispute. As

stated by SERB, the city is a "public employer" under R.C. 4117.01(B), and TPCOA is

an "employee organization" under R.C. 4117.01(D). TPCOA consists of 130 police

officers at the rank of sergeant, lieutenant, and captain. It is the exclusive representative

for the city's command officers. The relationship between TPCOA and the city is

governed by a collective bargaining agreement (CBA).

{¶ 3} In early 2009, TPCOA and the city began negotiating for a successor CBA

to replace the CBA that expired at the end of 2008.[1] Certain issues arose during those

negotiations, including the amount of money the city would contribute to the officers'

pensions and the amount it would contribute toward officers' health insurance premiums.

{¶ 4} Concerning pension contributions, section 65 of the expired CBA detailed a

"pension pickup" provision, which described the amount of money the city was to

contribute to each officer's pension fund. Ordinarily, the officers would be required to

contribute ten percent of their income toward their pension. However, under section 65,

the city agreed to pay the entire pension contribution. According to testimony provided

---

[1] CBAs between the city and TPCOA typically last for three years, with negotiations for a
new CBA beginning three months prior to the expiration of the current CBA.

2.

by TPCOA's president, Terry Stewart, the city previously agreed to "pickup" the officers' pension contributions in lieu of increasing their wages. In addition to its pension contributions, the city also agreed to pay the entire cost of the officers' health insurance premiums.

{¶ 5} As the negotiations for a successor CBA progressed, the city became aware of an impending budget deficit, which was largely attributable to declining income tax revenues and a faltering economy.[2] Consequently, on April 9, 2009, the city sent a letter to TPCOA withdrawing all economic proposals made by the city "due to a continuing downturn in the city's financial condition." During that time, the city proposed passing an ordinance declaring exigent circumstances, which would allow the city to reduce the deficit by, among other things, eliminating its pension pickup obligation and reducing officers' wages by ten percent. The proposed ordinance that was presented to city council acknowledged a budget deficit of $27 million for 2009. Additionally, on April 2, 2009, an article appeared in the Toledo Blade, reporting that then-mayor Carty Finkbeiner was considering bankruptcy in light of the city's "dire outlook." Ultimately, city council refused to pass the exigent circumstances ordinance.

{¶ 6} In May 2009, the Finkbeiner administration attempted, for a second time, to pass an exigent circumstances ordinance. This time, the administration sought to utilize

---

[2] According to the city's director of finance, Patrick McLean, income tax revenue makes up about 60 percent of the city's total revenue. The revenue generated from the income tax reached its peak in 2007, from which it declined "precipitously" starting in 2008.

3.

exigent circumstances in order to lay off 60 patrolmen and 15 command officers. The second effort also failed.

{¶ 7} The city eventually resumed bargaining with TPCOA in July 2009. On August 13, 2009, the city reached a tentative agreement with TPCOA in which the union agreed that: (1) members would be responsible for paying seven percent of their pension pickup for 15 consecutive pay periods; (2) medical copays would be added to members' health insurance plans; (3) overtime would be reduced; (4) wage increases would be eliminated for 2009; (5) promotions would be suspended; and (6) five positions would be eliminated. According to Stewart's testimony, the city saved between $3 million and $4 million as a result of these concessions.

{¶ 8} Eventually, TPCOA's members ratified the tentative agreement and the city adopted the agreement on August 18, 2009. The three-year agreement was retroactively effective beginning January 1, 2009. The agreement does not contain a provision for midterm bargaining.

{¶ 9} In November 2009, Michael Bell was elected mayor of Toledo. After the election, Bell appointed Steve Herwat as deputy mayor of operations for the city. As deputy mayor, Herwat was asked to lead Bell's transition effort. During the transition period, Herwat obtained a copy of the city's 2010 budget that was submitted by the Finkbeiner administration, which expressed a $30 million deficit. Mayor Finkbeiner planned to eliminate the deficit by imposing a refuse fee and eliminating tax credits for

4.

city residents who work outside the city. However, city council failed to enact the proposed changes prior to Bell taking office on January 4, 2010.

{¶ 10} By the time Bell took office, the city's budget deficit had ballooned to $37 million. Attempting to address the budget issues, Herwat met with the city's finance director to discuss the accuracy of the city's revenue projections for 2010. At the meeting, Herwat learned that the city's revenues were likely to fall short of the projections.

{¶ 11} In addition to its 2010 deficit, the city closed 2009 with a deficit of $8.4 million. Consequently, the city's 2010 deficit grew to approximately $44 million. The deficit presented a significant problem for the Bell administration because, under Ohio law and the city's charter, the city was required to pass a balanced budget by March 31, 2010.

{¶ 12} On January 10, 2010, Bell met with union leaders to discuss the budget deficit and seek their help in balancing the budget. The leaders were invited to attend meetings that Bell was conducting with members of the community in January and February to discuss the budget.

{¶ 13} On January 14, 2010, Bell sent a letter to city council informing them of a projected budget deficit of $43.86 million. Subsequent adjustments were made to the assumptions contained in the budget, resulting in an increase in the deficit to $48 million, which represented approximately 24 percent of the revenues generated in 2009.

{¶ 14} With the budget deficit issues in mind, Herwat sent Bell a memo on February 7, 2010, outlining the city's options for balancing the budget. According to the memo, the city had the potential to increase revenue by $35.9 million, cut expenditures by $20.2 million, and reduce labor costs by $18.9 million through modifications to labor contracts. Ultimately, Bell decided to address the deficit by utilizing a combination of all three options.

{¶ 15} Having ascertained the extent of the budget deficit, and the options for addressing it, Bell provided the adjusted figure to city council on February 10, 2010. On that same day, representatives for the city, TPCOA, and other city unions met to discuss concessions that would be necessary in order to balance the budget. At the meeting, the city proposed the elimination of pension pickups, a reduction in its payment of employee health care costs, and a reduction in base wages. The city asked the unions to respond to its proposal by February 25, 2010. The unions did not respond.

{¶ 16} While awaiting a resolution with its unions regarding the proposed concessions, the city began to address the deficit in other ways. By March 15, 2010, the city had enacted expenditure reduction measures that brought the deficit down to $28 million.

{¶ 17} One week later, a meeting was held between the city and its unions. At that meeting, TPCOA was informed that it would need to make concessions in the amount of $902,000 in order to assist the city in addressing the remaining budget deficit. To reach that amount, the city proposed eliminating the pension pickup and requiring TPCOA

6.

members to pay 20 percent of the total cost for their health insurance premiums.  TPCOA refused the city's proposal, and suggested that their share of the concessions could be reached by deferring overtime payments to the members.  In addition, TPCOA's board member, Michael McGee, explained to Herwat that the city was already set to save a substantial amount of money due to a hiring freeze implemented pursuant to the concessions made by the TPCOA and embodied in the existing CBA.  Furthermore, TPCOA's vice president, Dan Schultz, asserted that the concessions TPCOA made during the CBA negotiations with the Finkbeiner administration were given in order to address the economic situation facing the city at the time.

{¶ 18} In responding to TPCOA's assertions, city officials explained that the savings realized under the hiring freeze would not be credited toward the $902,000 goal because that money was already taken into consideration in the budget.  Further, Bell informed Schultz that TPCOA would be given no credit for the concessions it made during the course of CBA negotiations with the Finkbeiner administration.  Finally, TPCOA's offer to defer overtime payments was rejected on the basis that such deferrals were not a true savings since the payments would eventually need to be made.  Notably, the city agreed to a similar proposal made by the firefighters' union, Local 92, resulting in a 2010 savings of over $2 million.

{¶ 19} On March 26, 2010, the city's safety director, Shirley Green, telephoned TPCOA officials to ascertain whether TPCOA was willing to accept the city's proposal.  During the four days between the meeting and the telephone call, the city reached a

7.

settlement with the Toledo Police Patrolmens' Association. However, Green did not offer the same settlement to TPCOA. Ultimately, TPCOA refused the city's proposed concessions.

{¶ 20} With the March 31 deadline looming, the city decided it would need to unilaterally modify its labor contracts in order to pass a balanced budget and avoid shutting down the city. Accordingly, on March 30, 2010, city council passed a number of budget ordinances that included a declaration of exigent circumstances and a modification of its labor contracts. The ordinances took effect on April 1, 2010. Pursuant to the ordinances, the city unilaterally eliminated its pension pickup responsibilities and increased the health insurance copays for its exempt employees and members of six unions, including TPCOA. Members of two city bargaining units, Local 92 and Teamsters, were excluded from the unilateral modifications. According to Herwat's testimony before SERB, the city was forced to declare exigent circumstances because the city "did not have sufficient revenues in its 2010 budget to be able to meet the commitments that were made by the [Finkbeiner] administration in the contract that they negotiated." However, Herwat acknowledged that there were other options that could be selected to balance the budget as an alternative to declaring exigent circumstances, including laying off police officers, but those options were not feasible because city council refused to adopt them, presumably for political reasons. Further, Bell testified before SERB that he considered layoffs but decided not to utilize that option as a deficit-reduction strategy because the city was already operating with a "lean" staff

8.

and further reductions in numbers could jeopardize the city's economic development efforts.[3]

{¶ 21} On March 31, 2010, TPCOA filed a grievance with the city in an effort to prevent the city from making the changes to the CBA under the budget ordinances. The city denied the grievance, noting that the matter was not subject to arbitration because it involved "unilateral changes to the [CBA], via the enactment of Ordinance 103-10, that affect wages, hours, terms and conditions of employment within the meaning of R.C. 4117.08(C)."

{¶ 22} TPCOA filed several subsequent grievances with the city, complaining that the city violated the "me too" provision of the CBA by offering Local 92 a deal prior to the enactment of exigent circumstances that was never offered to TPCOA, and arguing that its members were not receiving the pay to which they were entitled under the CBA as a result of the elimination of the pension pickup. Once again, the city refused to process the grievances.

{¶ 23} As a result of the city's refusal to process the grievances, TPCOA filed a complaint with the Lucas County Court of Common Pleas on May 12, 2010, seeking, inter alia, to compel arbitration on the various grievances that had been filed with the

---

[3] In its decision, SERB found that the city ended up passing a budget with a surplus of $1.1 million for 2010. Further, SERB found that the city repealed the exigent circumstances provisions for every union except TPCOA, deciding instead to utilize the funds generated from the elimination of its pension pickup obligations to fund a new police class of 60 police officers.

9.

city. In addition, TPCOA filed an unfair labor practice charge with SERB on May 3, 2010.

{¶ 24} In its ULP charge, TPCOA complained that the city violated the terms of the CBA when it "announced that it would be unilaterally eliminating its payment of the 10% pension pick-up for bargaining unit employees, and also unilaterally increasing bargaining unit employee contributions for health care benefits." On June 3, 2010, SERB issued its finding of probable cause, thereby authorizing a complaint to be issued and referring the matter to an expedited hearing. SERB issued its complaint on July 12, 2010, alleging that the city's actions taken pursuant to the exigent circumstances ordinance constituted a violation of R.C. 4117.11(A)(1), and also amounted to a refusal to bargain in good faith in violation of R.C. 4117.11(A)(5).[4] On that same day, SERB set the matter for an evidentiary hearing. Subsequent to the filing of SERB's complaint, TPCOA moved to intervene in the action.

---

[4] R.C. 4117.11 sets forth the activities that constitute an unfair labor practice. Relevant here, subsection A provides:

> (A) It is an unfair labor practice for a public employer, its agents, or representatives to:
>
> (1) Interfere with, restrain, or coerce employees in the exercise of the rights guaranteed in Chapter 4117 of the Revised Code or an employee organization in the selection of its representative for the purposes of collective bargaining or the adjustment of grievances;
>
> * * *
> (5) Refuse to bargain collectively with the representative of his employees recognized as the exclusive representative or certified pursuant to Chapter 4117 of the Revised Code * * *.

10.

**{¶ 25}** A hearing was held before SERB on January 24, 2011. The issue to be decided by SERB was "whether immediate action was required by the City due to exigent circumstances that were unforeseen at the time of negotiations, thereby requiring the City to modify an existing collective bargaining agreement without the negotiation by and agreement of both parties." SERB issued its decision on April 29, 2011, in which it found that the city did not violate R.C. 4117.11(A)(1) and (5) when it "unilaterally increased the health-care premiums for [TPCOA members] and rescinded its 10% payment into the [TPCOA] pension fund." Accordingly, SERB dismissed the complaint, along with TPCOA's ULP charge.

**{¶ 26}** With regard to the question of whether the budget deficit constituted exigent circumstances, SERB stated:

> [T]he employer's predicament – facing a 24% funding deficit and requiring a budget that must be balanced, submitted to the legislative body, and a balanced budget adopted by said legislative body in less than three months, with potential spending reductions spread across six different bargaining units as well as exempt employees – certainly fits the description of exigent circumstances in the present case.

**{¶ 27}** As to foreseeability of the exigent circumstances, the opinion stated:

> Mayoral Candidate Michael Bell, while campaigning for the office, attempted to ascertain the City's financial situation. He was told that the City had a potential deficit for the next fiscal year of $10-15 million in

11.

April 2009, $20 million during the summer of 2009, and $30 million by the election. He was later told that the potential deficit would be $37 million (in December 2009), then $40 million (by the time he took office in January 2010), and finally $48.2 million (in February 2010). With a moving target that escalates from a potential deficit of 5% of expenditures to 24% of the Fiscal Year 2009 revenues, it would have been impossible to have foreseen those changes at the time that negotiations concluded in July 2009. This foreseeability determination is further complicated by the retroactivity within the CBA – it was negotiated in July 2009, but is effective from January 1, 2009 through December 31, 2011.

{¶ 28} Following the issuance of SERB's decision, TPCOA filed a timely appeal to the Lucas County Court of Common Pleas, asserting that SERB's decision was not supported by the evidence, and was contrary to R.C. 4117.11. Specifically, TPCOA argued that SERB's decision should be reversed for the following reasons: (1) SERB's decision ignores the city's duty to bargain to impasse prior to making a midterm modification to the CBA; (2) SERB erroneously concluded that the exigent circumstances were unforeseeable; (3) the decision erroneously permits the city to rescind a contract merely because of a projected budget deficit; and (4) the city's response to the exigent circumstances was overbroad.

{¶ 29} SERB responded to TPCOA's arguments by noting that (1) there was no time to bargain to impasse because the city had only three months to pass a balanced

12.

budget, (2) there was substantial evidence that the city could not have foreseen the rapid increase in the deficit and falling revenues, (3) its decision did not allow the city to rescind the CBA, but rather, allowed it to address the exigent circumstances without shutting down the city, and (4) TPCOA cannot argue that the city's response was overbroad because it failed to preserve the record on that argument.

{¶ 30} On April 22, 2013, the trial court reversed SERB's decision. In its entry, the court concluded that SERB failed to consider whether the city had bargained to impasse with TPCOA prior to its unilateral changes to the CBA, as required under SERB's opinion in *In re State Emp. Relations Bd. v. Toledo City School Dist. Bd. of Edn.*, SERB No. 2001-005, 2001 WL 36023280 (Oct. 1, 2001) ("*Toledo City Schools*"). Pointing to the ongoing negotiations that took place between the city and TPCOA after the exigent circumstances ordinance was passed, the court additionally concluded that the record only supports a finding that the city did not bargain to impasse. Thus, the court found that the city was not entitled to unilaterally modify the CBA. Ultimately, the court ordered the midterm changes rescinded and stated that TPCOA members should be provided equitable relief for the losses they sustained as a result of the midterm changes.

## B. Assignment(s) of Error

{¶ 31} Appellants have timely appealed the trial court's decision, each asserting their own assignments of error as follows:

SERB:

ASSIGNMENT OF ERROR #1: THE TRIAL COURT ERRED WHEN IT REVERSED THE STATE EMPLOYMENT RELATIONS BOARD'S DECISION DISMISSING THE TOLEDO POLICE COMMAND OFFICERS' ASSOCIATION (TPCOA) UNFAIR LABOR PRACTICE CHARGE AGAINST THE CITY OF TOLEDO ON THE BASIS THAT SERB MISINTERPRETED THE DOCTRINE OF "EXIGENT CIRCUMSTANCES."

ASSIGNMENT OF ERROR #2: THE TRIAL COURT ERRED WHEN IT DETERMINED THAT SERB'S DECISION WAS NOT SUPPORTED BY SUBSTANTIAL EVIDENCE.

ASSIGNMENT OF ERROR #3: THE TRIAL COURT ERRED WHEN IT SUBSTITUTED ITS JUDGMENT FOR THAT OF SERB AND FAILED TO ACCORD THE REQUISITE DUE DEFERENCE TO SERB'S FACTUAL FINDINGS AND SERB'S INTERPRETATION OF THE LAW.

{¶ 32} The city:

ASSIGNMENT OF ERROR #1: THE TRIAL COURT ERRED WHEN IT REVERSED AN ORDER FROM SERB AND RULED THAT THE CITY HAD COMMITTED AN UNFAIR LABOR PRACTICE BY

UNILATERALLY CHANGING THE COLLECTIVE BARGAINING AGREEMENT BETWEEN THE CITY AND THE TPCOA.

ASSIGNMENT OF ERROR #2: THE TRIAL COURT ERRED WHEN IT ADOPTED SERB'S REMEDY AND ORDERED THE CITY TO PROVIDE RELIEF TO THE MEMBERS OF TPCOA FOR ANY FINANCIAL LOSSES SUSTAINED AS A RESULT OF THE MID-TERM CHANGES.

## II. Standard of Review

{¶ 33} Our review of SERB's decision in the underlying unfair labor practice case is more deferential than that used by the trial court. *Akron v. State Emp. Relations Bd.*, 9th Dist. Summit No. 26227, 2013-Ohio-1213, ¶ 6; citing *State Emp. Relations Bd. v. Adena Local School Dist. Bd. of Edn.*, 66 Ohio St.3d 485, 491-492, 613 N.E.2d 605 (1993). In *Adena*, the Supreme Court of Ohio stated:

[D]ifferent standards of review are to be applied by a common pleas court and by a court of appeals when reviewing an order of SERB in a ULP case. When a common pleas court reviews a SERB order, the court must determine whether the order is supported by substantial evidence in the record. This standard of review for a common pleas court is supplied by R.C. 4117.13(D), which provides that "[t]he findings of the board [SERB] as to the facts, if supported by substantial evidence, on the record as a whole, are conclusive." *Adena* at 491-492, quoting *Lorain City Bd. of Edn.*

*v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 259-261, 533 N.E.2d 264 (1988).

{¶ 34} Substantial evidence has been defined as "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, but less than the weight of the evidence." *Oak Hills Edn. Assn. v. Oak Hills Local School Dist. Bd. of Edn.*, 158 Ohio App.3d 662, 2004-Ohio-6843, 821 N.E.2d 616, ¶ 12 (1st Dist.), citing *Consol. Edison Co. v. Natl. Labor Relations Bd.*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938). Substantial evidence has been further described as a "low burden." *Id.*

{¶ 35} In examining the trial court's review of SERB's decision, we are limited to a determination of whether the trial court abused its discretion. *Adena* at 492. If no abuse of discretion occurred, we must affirm the trial court. *Id.* An abuse of discretion connotes that the trial court's decision was unreasonable, arbitrary, or unconscionable. *Blakemore v. Blakemore*, 5 Ohio St.3d 217, 219, 450 N.E.2d 1140 (1983).

### III. Analysis

#### A. SERB's Interpretation of the Exigent Circumstances Doctrine

{¶ 36} In SERB's assignments of error, it argues that the trial court erroneously reversed SERB's decision on the basis that the city did not bargain in good faith, to ultimate impasse, as required under SERB's decision in *Toledo City Schools*. Likewise, in the city's first assignment of error, it argues that the trial court failed to properly defer to SERB's interpretation of the exigent circumstances doctrine. Because the parties' assignments of error are interrelated, we will address them simultaneously.

16.

{¶ 37} In *Toledo City Schools*, SERB was tasked with disposing of a dispute that arose between the Toledo City School District Board of Education (school board) and the Toledo Association of Administrative Personnel (TAAP). The dispute concerned the school board's decision to unilaterally implement an extended school day in order to comply with a statute that went into effect three years earlier, which required students to complete an increased number of units in order to graduate. The relevant CBA included a provision governing extension of school days and a concomitant obligation to compensate TAAP members when such an extension takes place. Despite the provision, the school district's superintendent sent TAAP a proposal to extend the work day without an increase in members' compensation. After extensive negotiations between the parties, the school district notified TAAP that it was implementing its proposal over TAAP's objections. Soon thereafter, TAAP filed a ULP charge with SERB.

{¶ 38} In its charge, TAAP alleged that the school district violated R.C. 4117.11(A)(1) and (5) by unilaterally modifying the terms of the underlying CBA. Upon a finding of probable cause, SERB held a hearing to determine "whether the District engaged in bad-faith bargaining when it implemented its final proposal and modified Article VIII of the CBA." *Toledo City Schools*, SERB No. 2001-005, 2001 WL 36023280 at *3. In resolving this issue, SERB stated:

> Where the parties have not adopted procedures in their collective bargaining agreement to deal with midterm bargaining disputes, SERB will apply the following standard to determine whether an unfair labor practice

17.

has been committed when a party unilaterally modifies a provision in an existing collective bargaining agreement after bargaining the subject to ultimate impasse as defined in [*In re Vandalia-Butler City School Dist. Bd. of Ed.*, SERB No. 90-003, 1989 WL 1633487 (Feb. 9, 1990)]:

A party cannot modify an existing collective bargaining agreement without the negotiation by and agreement of both parties unless immediate action is required due to (1) exigent circumstances that were unforeseen at the time of negotiations or (2) legislative action taken by a higher-level legislative body after the agreement became effective that requires a change to conform to the statute. *Id.* at *6.

{¶ 39} Under the legislative-action prong, SERB found that the statute at issue was passed before an agreement was reached regarding the relevant CBA. *Id.* Consequently, SERB determined that the school board's action was not justified under the legislative-action prong. Further, SERB concluded that the action was not valid under the exigent circumstances prong, because the school board waited over two years to begin negotiations with TAAP regarding an extended school day. *Id.* Finding no justification for the school board's actions, SERB held that the school board violated R.C. 4117.11(A)(1) and (5) when it unilaterally extended the school day without providing additional compensation to TAAP members. *Id.*

{¶ 40} Applying *Toledo City Schools* to this case, the trial court reversed SERB's decision, finding that the parties were not at ultimate impasse when the city modified the

18.

CBA.  The court noted that SERB failed to make a finding that the city bargained in good faith or to ultimate impasse with TPCOA prior to modifying the CBA.  Further, the court found that substantial evidence would not support such a finding.

{¶ 41} Having thoroughly examined the record that was before SERB, we agree that the parties were not at ultimate impasse when the city unilaterally modified the CBA. Regarding ultimate impasse, SERB has stated:

> Ultimate impasse is a legal concept adopted from the private sector. The test developed by the NLRB as to whether there is an ultimate impasse is reflected and approved in the case of [*Am. Fedn. of Television and Radio Artists, AFLCIO, Kansas City Local v. National Labor Relations Bd.*, 395 F.2d 622, (D.C. Cir.1968)], and appears to be whether there is "no realistic possibility that continuation of discussion at that time would have been fruitful."  Under NLRB case law the existence of an impasse is very much a question of fact, and many factors are considered in such factual determinations.  "The bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is disagreement, the contemporaneous understanding of the parties as to the state of negotiations are all relevant factors to be considered in deciding whether an impasse in bargaining exists." *Taft Broadcasting Co.*, 163 NLRB 475, 478 (1967).  Thus, an ultimate impasse is not a point in time which can be predetermined in

theory. It is a case by case determination involving the development of a record with enough factual data to determine whether at what point good faith negotiations towards reaching an agreement have been exhausted. *Vandalia-Butler*, *supra*, SERB No. 90-003, 1989 WL 1633487 at *7.

{¶ 42} Here, the record does not support a finding that the city bargained in good faith to ultimate impasse. Appellants contend that ultimate impasse was reached on March 30 (the day before the city was required to pass a balanced budget). However, *Vandalia-Butler* did not create a bright-line rule allowing the city to determine that it is at ultimate impasse simply because it is under an obligation to balance its budget and has failed to do so by the deadline. Were we to adopt such a rule, we would be allowing the city to shift its responsibility for balancing the budget to its unions. Moreover, we would be ignoring the factor-based analysis instituted in *Vandalia-Butler*. We decline to do so. We recognize that the city was running up against a deadline. However, TPCOA is entitled to good faith bargaining to ultimate impasse and the city's requirement to balance its budget does not eliminate TPCOA's rights.[5]

{¶ 43} Looking at the record before us, we find that TPCOA was given little opportunity to bargain with the city. When presented with TPCOA's offer to save the city $902,000 by deferring overtime payments, the city flatly rejected the offer, stating

---

[5] Notably, the record demonstrates that there were a range of available options that would have allowed the city to balance its budget without forcing union concessions. Nonetheless, the city elected to utilize a mix of those options that included union concessions.

that such deferrals were not a true savings since the payments would eventually need to be made. Despite the city's concerns, it allowed Local 92 to defer overtime payments as a cost-savings measure. Additionally, the city reached a settlement with the Toledo Police Patrolmens' Association, but failed to offer the same arrangement to TPCOA. Having examined the record, we agree with the trial court when it found that:

> Toledo made no reasonable effort to meet the TPCOA part way before unilaterally modifying the CBA. Rather, Toledo proposed that the union members pay their own pension contributions and pay higher premiums for health care insurance and summarily rejected the union's proposed alternatives. Eight days later, after the TPCOA declined to offer any specific concessions, Toledo implemented its *first and only specific offer* and passed the "exigent circumstances" ordinances eliminating pension pick-ups and increasing health care costs for all City employees except the members of two bargaining units. * * * Toledo did not bargain in good faith, and instead engaged only in surface bargaining, before unilaterally changing the terms of the TPCOA's CBA.

> * * *

> Instead of engaging in meaningful negotiation, Toledo made the unilateral changes and then negotiated with the union, as it did with five other bargaining units. Such post-implementation bargaining was bad-faith

bargaining that violated R.C. 4117.11(A)(1) and (A)(5) and the rule of law set forth in *Toledo* [*City*] *Schools*. (Emphasis sic.)

{¶ 44} Moreover, we find that the exigent circumstances relied upon by the city (i.e. the budget deficit) were foreseeable at the time the CBA was negotiated. Indeed, the city was already facing budget deficits and a flailing economy when it executed the CBA on August 18, 2009. As indicated above, *Toledo City Schools* only permits an employer to unilaterally modify a CBA based on exigent circumstances that are *unforeseen*. *Toledo City Schools*, SERB No. 2001-005, 2001 WL 36023280 at *6.[6]

{¶ 45} While we recognize that the budget deficits were initially smaller and constantly escalating, the economic indicators that were before the city during CBA negotiations should have led the city to conclude that the deficit would balloon over time. For example, income tax revenues for the city dropped from $169,689,103 in 2007 to $154,475,390 in 2008, a 9.4 percent decline. Thereafter, tax revenue declined another 8.7 percent from 2008 to 2009. Furthermore, the city was well aware of the crippling national recession that hit Northwest Ohio particularly hard. Given the rising unemployment throughout the city due to the recession, it was likely that the city's revenue from income taxes would continue to decline for the foreseeable future. This downward trend in revenues was before the city at the time of CBA negotiations.

---

[6] Here, the parties acknowledge that *Toledo City Schools'* legislative-action prong does not apply to this case. Thus, only the exigent circumstances prong is at issue.

22.

{¶ 46} That the city was aware of the impending deficit is demonstrated in its letter sent to TPCOA on April 9, 2009, in which the city recognized "a continuing downturn in the city's financial condition." Additionally, the city attempted to declare exigent circumstances on two separate occasions based on budget issues prior to agreeing to the CBA. The situation was so grim, in fact, that Mayor Finkbeiner was contemplating bankruptcy.

{¶ 47} In light of the foregoing evidence, which is not in dispute, we find that SERB's decision was not supported by substantial evidence. By extension, we find that the trial court did not abuse its discretion in reversing SERB's decision. Accordingly, SERB's assignments of error and the city's first assignment of error are not well-taken.

## B. The Trial Court's Remedy

{¶ 48} In its second assignment of error, the city argues that the trial court erred in adopting SERB's remedy directing the city to provide equitable relief to TPCOA members for any losses sustained as a result of the unilateral changes to the CBA. The city asserts that the trial court ignored the fact that all of the other unions were forced to make concessions with the city. The city contends that TPCOA would have made concessions had the city not declared exigent circumstances and unilaterally modified the CBA. In light of those concessions, the city argues that the trial court's judgment creates a windfall for TPCOA members.

{¶ 49} TPCOA, for its part, argues that the trial court properly deferred to the remedy set forth by SERB. TPCOA contends that the remedy provided is the "traditional

23.

remedy for unlawful unilateral changes in terms and conditions of employment." We agree with TPCOA's contention that the remedy provided in this case was the appropriate, customary remedy.

{¶ 50} Historically, SERB has remedied unlawful midterm modifications to a CBA by ordering the employer to "rescind the unilateral implementation of [the midterm changes], thereby returning the parties to the status quo ante." *Toledo City Schools*, SERB No. 2001-005, 2001 WL 36023280 at *7. That is precisely the remedy imposed in this case. We see no reason to conclude that the trial court abused its discretion in adopting SERB's remedy. The city's argument invites us to speculate as to the concessions that might have been made had the unilateral modifications not been imposed. We decline to so speculate.

{¶ 51} Accordingly, the city's second assignment of error is not well-taken.

## IV. Conclusion

{¶ 52} Having found each of appellants' assignments of error not well-taken, we affirm the judgment of the Lucas County Court of Common Pleas. Appellants are ordered to pay the costs of this appeal pursuant to App.R. 24.

Judgment affirmed.

A certified copy of this entry shall constitute the mandate pursuant to App.R. 27. *See also* 6th Dist.Loc.App.R. 4.


Thomas J. Osowik, J.                    _____
                                                        JUDGE

Stephen A. Yarbrough, P.J.
CONCUR.                                    _____
                                                        JUDGE

James D. Jensen, J.,
DISSENTS.


**JENSEN, J.**

{¶ 53} I respectfully dissent from the majority's decision because in affirming the trial court's judgment, the majority has effectively undermined the broad authority that the legislature granted to SERB to administer and enforce R.C. Chapter 4117.

{¶ 54} The trial court's role in reviewing TPCOA's appeal was to determine whether substantial evidence existed in the record to support SERB's decision. *Univ. Hosp., Univ. Cincinnati College of Medicine v. State Emp. Relations Bd.*, 63 Ohio St.3d 339, 343, 587 N.E.2d 835 (1992). As the majority recognizes, "substantial evidence" is a low burden. *Oak Hills Edn. Assn. v. Oak Hills Loc. School Dist. Bd. of Edn.*, 158 Ohio App.3d 662, 2004-Ohio-6843, 821 N.E.2d 616, ¶ 12 (1st Dist.). "Substantial evidence,"

25.

as defined by the United States Supreme Court, means "such relevant evidence that a reasonable mind might accept as adequate to support a conclusion, but less than the weight of the evidence." *Id.,* citing *Consol. Edison Co. v. Natl. Labor Relations Bd.*, 305 U.S. 197, 59 S.Ct. 206, 83 L.Ed. 126 (1938).

{¶ 55} The trial court's decision reversing SERB turned completely on its conclusion that the city did not bargain in good faith and the parties did not reach ultimate impasse. The majority's decision concludes both that the city failed to bargain in good faith to ultimate impasse, and that the budget deficit precipitating the declaration of exigent circumstances was foreseeable. I dissent from the majority decision because I believe there was substantial evidence in the record contrary to both conclusions.

{¶ 56} As discussed by both the trial court and the majority, the concept of the exigent circumstances doctrine was expressed by SERB in *In re Toledo City School Dist. Bd. of Edn.*, SERB No. 2001-005, 2001 WL 36023280 (Oct. 1, 2001). There, the school board entered into a CBA with the administrative employees' union effective February 1, 1998, knowing that the legislature had passed legislation in 1997 that would require students to have additional education credits in order to graduate after September 15, 2001. The CBA was extended by mutual agreement and remained in effect until March of 2001. The school board waited until February of 2000 to begin efforts to comply with the legislation. It proposed extending the school day to allow for additional credits, without additional compensation to union members. When the union would not agree to the school board's proposal, the school board unilaterally modified the CBA.

26.

**{¶ 57}** SERB recognized that parties must be able to respond to emergencies that arise during the term of a CBA, therefore, it devised a standard to be applied where the parties have not adopted procedures for addressing mid-term bargaining disputes and have failed to reach agreement "after bargaining the subject to ultimate impasse." It carved out the "exigent circumstances" and "legislative action" doctrines. In *Toledo City School Dist.,* it ultimately concluded that the school board's two-and-one-half year delay in taking action to comply with the legislation, despite knowing of the legislative changes before finalizing the parties' existing CBA, precluded it from availing itself of the doctrine.

**{¶ 58}** What constitutes "ultimate impasse" was addressed in *Toledo City School Dist.* and was discussed at length in *In re Vandalia-Butler City School Dist. Bd. of Edn.,* SERB No. 90-003, 1989 WL 1633487 (Feb. 9, 1990). SERB described it as "the point at which good faith negotiations towards reaching an agreement have been exhausted." *Vandalia-Butler City School Dist.* at *7. To be at ultimate impasse there must be "no realistic possibility that continuation of discussion at that time would have been fruitful." *Id.*

**{¶ 59}** As the majority acknowledges, SERB emphasized in *Vandalia-Butler* that "an ultimate impasse is not a point in time which can be predetermined in theory." *Id.* "It is a case by case determination involving the development of a record with enough factual data to determine whether at what point good faith negotiations towards reaching an agreement have been exhausted." *Id.* It requires consideration of many factors,

27.

including "the bargaining history, the good faith of the parties in negotiations, the length of the negotiations, the importance of the issue or issues as to which there is agreement, and the contemporaneous understanding of the parties as to the state of negotiations." *Id.* Whether a party has bargained in good faith must be determined by the totality of the circumstances. *Toledo City School Dist.*, SERB No. 2001-005, 2001 WL 36023280 at *4.

{¶ 60} Although it recognizes the correct analysis to be applied, the effect of the majority's decision is to permit the trial court to usurp SERB's role in making this highly fact-specific determination.

{¶ 61} The parties developed an extensive record during administrative proceedings and SERB issued a thorough opinion. In it, SERB recited the detailed timeline of contacts that occurred between the parties. It recognized that Bell, while transitioning into his new position as Toledo's mayor, faced a March 31, 2010 deadline for proposing a balanced budget that city council would pass. It found that Bell took office January 4, 2010 and met with union leaders, including TPCOA, on January 10, 2010, to enlist their help in addressing the budget shortfall. SERB found that Bell and his staff conducted meetings in the community throughout January, February, and March to discuss the budget and invited union leaders to attend. He met with union leaders again on February 10, 2010, and asked for mid-term concessions, setting forth his specific proposal for trimming expenses and seeking a response by February 25, 2010. TPCOA opted not to respond.

28.

{¶ 62} Mayor Bell met with TPCOA leadership again on March 22, 2010, again setting forth his proposal for decreasing the budget deficit, but making clear that he would welcome other proposals that could net the city savings of $902,000. Although not specifically addressed in SERB's findings, the only proposals made by TPCOA along the way were to defer overtime compensation, which Mayor Bell told them was not a feasible solution given the strain that would be placed on the 2011 budget, and to refrain from filling positions vacated due to retirements—a "savings" the city had already factored in. This was communicated to TPCOA. As the city approached the March 31, 2010 deadline for passing a balanced budget—a deadline of which TPCOA was well aware—TPCOA president Sergeant Stewart unequivocally stated to Safety Director Green on March 26, 2010, that TPCOA was making no concessions.

{¶ 63} SERB also detailed the efforts made by the city to close the budget deficit by other means, including increasing fees to citizens, selling city-owned assets, considering different taxes to increase revenue, and by seeking concessions from city employees. With the March 31, 2010 deadline looming, a deficit still remaining, and TPCOA's heels firmly dug in, SERB found that the city was forced to take immediate action by passing the exigent circumstances ordinance and going forward with unilateral modifications.

{¶ 64} The majority insists that "bargaining to impasse" is a "factor-based analysis" that it would be ignoring were it to find that impasse was reached the day before the balanced budget was required to be passed. *Toledo City School Dist.,* SERB

29.

No. 2001-005, 2001 WL 36023280 at *4, makes clear, however, that the totality of the circumstances must be considered. SERB considered the totality of the circumstances, including Mayor Bell's multiple attempts to engage TPCOA in discussions, the other efforts pursued by the city to balance the budget, the harm that would have befallen the city had a balanced budget not been achieved, and TPCOA's flat refusal to offer concessions despite being aware that the city was up against a statutory deadline.

{¶ 65} SERB's recitation of these facts immediately preceded its explanation of what constitutes "ultimate impasse" under *Vandalia-Butler City School Dist.,* SERB No. 90-003, 1989 WL 1633487, and its recognition of the duty to bargain in good faith. As defined in *Vandalia-Butler,* the facts SERB cited make clear that TPCOA was unwilling to make any concessions before the imminent deadline for passing the budget, thus "continuation of discussions *at that time* would [not] have been fruitful." (Emphasis added.) *Compare Twinsburg City School Dist. Bd. of Edn. v. State Emp. Relations Bd*., 172 Ohio App.3d 535, 2007-Ohio-957, 876 N.E.2d 580 (9th Dist.) (finding ULP where school board unilaterally implemented its "last, best offer" despite union's expressed willingness to move with respect to all open issues). In concluding that the city properly modified the CBA due to exigent circumstances, SERB implicitly and reasonably determined that the parties had reached ultimate impasse and that the city bargained in good faith.

30.

{¶ 66} In sum, there was substantial evidence contained in the record to support SERB's conclusion that an ultimate impasse had been reached. The trial court abused its discretion by substituting its factual determinations for those of the agency.

{¶ 67} Although not addressed by the trial court, TPCOA also argued—and the majority agrees—that the extent of the budget deficit was foreseeable at the time the CBA was negotiated in mid-2009. While professedly refusing to engage in speculation, the majority does just that in concluding that the city should have foreseen the exponential increase in the amount of the deficit. I find that there was substantial evidence to support SERB's contrary conclusion that the extent of the deficit was unforeseen.

{¶ 68} To continue operating, the city was required to approve a balanced budget by March 31, 2010. That meant that Bell had 86 days to balance the budget. As SERB described, the budget deficit was "a moving target that escalate[d] from a potential deficit of 5% of expenditures to 24% of the Fiscal Year 2009 revenues." At the time the CBA was being negotiated in the summer of 2009, the deficit was projected at $10-$15 million. By the time Bell was elected mayor, it had risen to $37 million and continued to climb to over $48 million. The measures required to shrink a $10-$15 million deficit would necessarily be different than what would be required to shrink a $48 million deficit. In fact, had the deficit remained the same as it was when Bell first started inquiring about it, it seems likely that the city may not have sought concessions from the unions at all.

31.

{¶ 69} The testimony of Stephen Herwat, the deputy mayor for operations under the Bell administration, illustrates this point. Herwat testified that Bell asked him to lead in transitioning from the former Finkbeiner administration to the new Bell administration. In doing so, Herwat obtained a copy of the budget submitted to city council by the Finkbeiner administration in November of 2009. That budget identified a $30 million deficit with a proposal that the deficit be bridged by instituting a refuse fee in January 2010 and eliminating a tax credit for people who live in Toledo but work outside the city. Herwat testified that when Bell took office on January 4, 2010, that proposal was before city council but council had not yet acted. The landscape changed yet again in December of 2009 when Finkbeiner told the Bell administration that the deficit would more likely be in the neighborhood of $37 million, and again when the lower-than-expected revenue from 2009 was accounted for.

{¶ 70} It is undisputed that Toledo anticipated a budget deficit for 2010. But it is too simplistic to say that because the city anticipated a budget deficit, exigent circumstances were foreseen. The projected deficit ranged between five percent-ten percent ($10-$20 million) during negotiation of the CBA. There was no evidence in the record to suggest that the city could have known in mid-2009 that the projected deficit would quadruple to 24 percent ($48 million) by February of 2010. There was, therefore, no reason that the city should have foreseen that concessions from the bargaining units would have been so crucial in arriving at a balanced budget. The uncertainty of the extent of the budget crisis makes this case far different than *Toledo City School Dist.,*

32.

SERB No. 2001-005, 2001 WL 36023280, where the school board waited two-and-one-half years before approaching the union with the proposal for complying with legislative changes.

{¶ 71} Given the rapidly-escalating deficit projections the city faced, I find that SERB's determination that "immediate action was required due to exigent circumstances that were unforeseen at the time of negotiations" was supported by substantial evidence.

{¶ 72} Although I realize that as an appellate court we review the lower court's decision for an abuse of discretion only, it is our responsibility to investigate whether the lower court accorded due deference to SERB. *Univ. Hosp.,* 63 Ohio St.3d at 343, 587 N.E.2d 835. "Where the common pleas court has not properly deferred to the factual determinations of the agency as required by R.C. 4117.13(D)," it is within our authority to reverse the lower court and to reinstate the order of the agency. *Id.* at 343-344. Here, the majority has allowed the trial court to disregard SERB's "considerable expertise in labor-management relations," to ignore the extreme deference it owes to SERB's factual determinations, and to substitute its own judgment for that of SERB's. *Lorain City School Dist. Bd. of Edn. v. State Emp. Relations Bd.*, 40 Ohio St.3d 257, 260-61, 533 N.E.2d 264 (1988); *Univ. Hosp.* at 343. I would reverse the trial court's judgment and reinstate the SERB decision.

This decision is subject to further editing by the Supreme Court of Ohio's Reporter of Decisions. Parties interested in viewing the final reported version are advised to visit the Ohio Supreme Court's web site at: http://www.sconet.state.oh.us/rod/newpdf/?source=6.